In the Matter of the Rehabilitation of the BOND AND MORTGAGE GUARANTEE COMPANY.

Supreme Court, Kings County, November 12, 1935.

*Rapaport Brothers* [*Henry N. Rapaport* of counsel], for Sylvia Zubow and others, the moving parties.

*Benjamin J. Rabin* [*Lawrence S. Greenbaum*, special counsel], for the Mortgage Commission of the State of New York.

*J. Donald Whelehan*, for Louis H. Pink, Superintendent of Insurance of the State of New York, as rehabilitator of the Bond and Mortgage Guarantee Company.

*Hughes, Schurman & Dwight [Oscar R. Ewing and John F. Caskey of counsel], and Mitchell, Taylor, Capron & Marsh [William D. Mitchell of counsel], for the Bond and Mortgage Guarantee Corporation.*

*Milbank, Tweed, Hope & Webb [Timothy M. Pfeiffer of counsel], for the Title Guarantee and Trust Company.*

BROWER, J. It will tend to a better understanding of the issues involved in the applications presently under consideration if we as briefly as may be consistent with clarity, trace the origin and gradual development of the statutory authority exercised by the State through the Superintendent of Insurance over delinquent insurers under his supervision and particularly with respect to such authority in its exercise over Bond and Mortgage Guarantee Company, one of such insurers. The business of insurance is one within the police power of the State to regulate, for the general good.

The right of the Superintendent of Insurance of this State to proceed against delinquent insurers is embodied in article XI of the Insurance Law. This right, however, is one of comparatively recent origin and seems to be the outgrowth of early Federal statutes dealing with the liquidation of National banks. As long ago as the year 1864, the Congress of the United States passed an act giving the Comptroller of the Currency certain powers with respect to the liquidation of such banks. The Report of the Commission on Banks submitted to Governor Hughes, December 16, 1907 (at p. 20), recommended that the Superintendent of Banks be given much the same powers in the liquidation of State banks, and chapter 143 of the Laws of 1908 was the legislative response to that recommendation. This legislation gave the Superintendent of Banks certain powers over delinquent banking institutions, but did not extend such or similar powers to the Superintendent of Insurance over delinquents under his jurisdiction. The omission, however, was supplied the next year, on the recommendation of Governor Hughes, in the enactment of chapter 300 of the Laws of 1909 and, as section 63 of the Insurance Law, made possible proceedings also against delinquents in the field of insurance. After several amendments, said section 63 was repealed by the Laws of 1932, chapter 191, section 1, effective March 15, 1932, and article XI took its place. Article XI, as amended, now constitutes for the Superintendent of Insurance his charter in proceedings against delinquent insurers.

Under old section 63 the rehabilitation and liquidation of insurers was provided for, but rehabilitation was seldom resorted to because the occasion for using it did not present itself. With, however, the advent of the banking holiday of March, 1933, if not before, the virtue of a statute of the character of article XI became obvious and the Superintendent of Insurance has, as we know, since invoked its provisions in a large number of cases. Under said article, the powers of the Superintendent have been much enlarged. The article is not emergency legislation, and now includes sections 400 to 428, both inclusive, of the Insurance Law.

Section 400 applies to " all corporations, associations, societies, orders, partnerships, and individuals to which any article of this chapter is applicable, or which are subject to examination or supervision under any section of this chapter, or which are doing or attempting to do or representing that they are doing the business of insurance in this state," and where the word " insurer " is used in said article, it " includes all of the above named corporations, associations, societies, orders, partnerships and individuals." The delinquencies which constitute the usual grounds for an application to rehabilitate or to liquidate a domestic insurer are embodied in section 401 of article XI. If the order is for rehabilitation, it directs the Superintendent to take possession of the property and to conduct the business of such delinquent insurer and/or to take such steps toward the removal of the causes and conditions which made the proceeding necessary as the court shall direct; if for liquidation, the Superintendent is directed to take possession of the property of such insurer, to liquidate the business and to give notice to all creditors to present claims and " title " to such property is vested in him, by operation of law. At any time that the Superintendent deems further efforts in rehabilitation futile he may apply to the court for an order to liquidate. On the other hand, he or a person interested may, pursuant to article XI, apply for an order to terminate rehabilitation and permit the delinquent to resume the possession of its property and the conduct of its business. The court is expressly authorized to issue injunctions in furtherance of the rights of the Superintendent, or to prevent waste of the assets of the insurer, or for other purposes (§ 410, subds. 1 and 2).

When, thereafter, the critical conditions prevailing at the time of the banking holiday confronted the people of this country, the Legislature found a public emergency to exist which it felt called for its intervention, and by chapter 40 of the Laws of 1933 it conferred on the Superintendent of Insurance temporary power to make emergency rules and regulations, the purpose of which it declared,

in the amendment thereof effected by chapter 10 of the Laws of 1934, was "to provide that the business of any insurer subject to the insurance law shall be conducted with safety and expediency, to maintain public confidence in such business, to conserve the assets of such insurers and thus to protect the public interest and the interests of policyholders, beneficiaries, creditors and stockholders." This enactment might appropriately, but for its emergency character, have been carried into the Insurance Law.

The Insurance Law contained no express provision for the administration by the Superintendent of "mortgage investments" sold or guaranteed by the guaranty companies taken over by him, and such investments were a matter of no little concern to a large number of holders. Such administration over bonds and mortgages guaranteed by insurers taken over for rehabilitation or liquidation as the Superintendent of Insurance assumed prior to his express power to do so under chapter 745 of the Laws of 1933, as amended (hereafter sometimes referred to as the "Schackno Act"), was attributed to his power to conduct the business of any such insurer; and when the business conducted by any such insurer included the administration of mortgages pursuant to a guaranty policy, the Superintendent, as the statutory receiver, commonly assumed the administration thereof. Under the Insurance Law, the Superintendent administered both wholly owned mortgages and certificated mortgages, guaranteed by the insurer taken over.

Several months after the enactment of chapter 40 of the Laws of 1933, however, the Legislature, by chapter 745 of the Laws of 1933, effective May 3, 1933, passed the so-called Schackno Act, an emergency law whose constitutionality has been unsuccessfully assailed. The Schackno Act applies "to any title and mortgage guaranty corporation organized and now existing under the insurance law or to any investment company organized and now existing under the banking law, which shall have sold mortgage investments as hereinafter defined." It commonly uses the term "guaranty corporations" and that term includes any "such title and mortgage guaranty corporations and investment companies." When the act speaks of "mortgage investments" it intends to include "all interests in bonds, notes and other evidence of indebtedness of individuals, partnerships, associations or corporations, secured by mortgage or mortgages or deeds of trust or similar evidence of interest in real estate upon real property, guaranteed by a guaranty corporation;" and all collateral trust bonds or notes of a guaranty corporation which are secured by pledge of any such interests, but does not include any such bond, note or other evidence of indebtedness when the same is held entirely by only one

person, firm or corporation or any such collateral trust obligations when all of them having the same security are so held. (Laws of 1933, chap. 745, as amd. by Laws of 1933, chap. 780.)

As its title indicates, the act is one " to provide for the protection of holders of mortgage investments guaranteed by title and mortgage guaranty corporations and investment companies," and the instrumentality designated to carry out the legislative purpose is the Superintendent, *i. e.*, " the superintendent of insurance or the superintendent of banks having supervisory or regulatory powers under existing law over such title and mortgage guaranty corporations or investment companies as the case may be."

There is no provision, so far as the court is aware, in any usual policy contract which undertakes to prescribe what shall be the consequence of, or what shall be the procedure upon, a failure of the guaranty corporation to fulfill the terms of its contract of guaranty. Until such time, then, as the holders of such mortgage investments organize their membership and reorganize their security, there will be in numerous cases a period, a hiatus, during which their security may be without administration, or without adequate administration, and the Schackno Act purposed to fill this gap until such time as the certificate holders themselves assume control of their mortgage or other security. And so we find that by sections 3 and 4 of said act, there were conferred certain enabling powers upon the Superintendent. He was empowered, in certain eventualities, himself or by his duly authorized agent (and he could appoint as his agent the guaranty corporation involved in the default or any officer thereof or any other person or corporation), to " take over, administer, exercise, conduct, execute and manage " with discretion to limit, control and regulate any or all of the " functions of any guaranty corporation " with respect to any mortgage investment sold or guaranteed by such guaranty corporation, whenever he felt such action was necessary or advisable for the protection of such corporation or of the holders of such " mortgage investment;" and in using the phrase " functions of any guaranty corporation," the Legislature declared that it included " any or all of the duties, rights, functions, remedies and powers conferred with respect to any mortgage investments upon any guaranty corporation, directly or indirectly, by virtue of any statute, agreement or otherwise."

With respect to any bonds, mortgages or other security held by such guaranty corporation or otherwise, against which mortgage investments had been issued, the Superintendent was further empowered, by himself or by authorized agent, to receive, collect, sue for the principal and interest of such bonds and mortgages and other security so held; to foreclose and take title in any name he

desired; to deduct from any sum so obtained a reasonable sum for costs and expenses incurred in the performance of his powers; and to distribute or withhold the balance of such sums so collected, as in said act provided.

When the Superintendent has exercised any of his powers granted under sections 3 or 4 of the Schackno Act, he is also in a position to take, in addition, steps for the reorganization of a mortgage investment.

As already noted, proceedings instituted under article XI of the Insurance Law have in view the preservation, through the intervention of the Superintendent, of the property and assets of the insurer in the general interest of all persons interested therein, while the Schackno Act more particularly defines his powers, in the interests of certificate holders, over the guaranty corporations under his jurisdiction and the bonds and mortgages against which mortgage investments have been issued. Under both enactments, the Superintendent is the officer upon whom these statutes confer the authority to carry out the legislative purposes. The Schackno Act became effective May 3, 1933, and although several times amended, it is still on the statute books of the State and must be read since February 5, 1935, the date that chapter 19 of the Laws of 1935 (the so-called Mortgage Commission Act) became effective, in conjunction therewith.

The Mortgage Commission Act is emergency legislation, too, and is to be effective until January 1, 1940. To meet the emergency declared by this act, the Legislature set forth its purpose to confer " power upon a new state agency to act promptly and to encourage, promote and facilitate self-organization by the holders of mortgage investments until such time as there may be established other effective organizations for the administration of their interests." The Commission is a State agency and is declared a " body corporate and politic;" the powers conferred by the act are in effect its charter. These powers are very extensive, and those contained in section 4 are designated " General Powers " and those in section 5 " Limited Powers;" the latter are in addition to the general powers conferred. Section 6, entitled " Functions of the commission," as amended, now reads as follows:

" § 6. Functions of the commission. The commission shall, within six months after the appointment and qualification of all its members, or within six months after entry of the order of rehabilitation or liquidation, in the case of a guaranty corporation which shall be taken over for rehabilitation or liquidation after this act takes effect, take over from the superintendent of insurance and/or the superintendent of banks, as the case may be, and from any

agent appointed by either of them, *and from any corporation wholly owned by either of them, or any subsidiary thereof, and from any corporation organized or existing under the banking or insurance laws which issued and disposed of by sale or otherwise any outstanding mortgage investments guaranteed by any guarantee corporation in rehabilitation or liquidation,* and from all guaranty corporations in rehabilitation or liquidation, their affiliates and subsidiaries, if any, and from all depositaries, custodians and agents acting in respect thereof, possession and control of, and legal title to all of the bonds, notes, other evidences of indebtedness and mortgages in respect whereof outstanding mortgage investments have been issued or guaranteed by such guaranty corporations and all property of every kind, nature or description acquired by any method in lieu thereof, or as security therefor, together with all accumulated income, increment and profits thereon, at the date of such taking over as herein determined, *including any and all contracts incident to the management, servicing or control of such bonds, notes, other evidences of indebtedness, mortgages, properties or securities, which contracts were made a part of any court order heretofore entered in a reorganization proceeding under section seven hundred forty-five of the laws of nineteen hundred thirty-three as amended.* Within the time hereinabove, by this section, prescribed, the commission shall, with respect to each such guaranty corporation, *or other corporation,* serve upon and file with the superintendent of insurance or the superintendent of banks, as the case may be, a written notice stating that on a day certain therein specified, not less than five days nor more than ten days after such service and filing, the commission will take possession and control of, and legal title to, all such bonds, notes, evidences of indebtedness and mortgages in respect whereof outstanding mortgage investments have been issued or guaranteed by such guaranty corporation and any and all such property acquired in lieu thereof or as security therefor, *including any and all contracts incident to the management, servicing or control of such bonds, notes, other evidences of indebtedness, mortgages, properties or securities, which contracts were made a part of any court order heretofore entered in a reorganization proceeding under section seven hundred forty-five of the laws of nineteen hundred thirty-three as amended.* Each such notice shall be signed by the chairman of the commission with the seal of the commission thereto affixed and shall be acknowledged by him in the manner required by law for acknowledgments of deeds of conveyances to be recorded. A duplicate original of each such notice shall forthwith be filed by the commission with the clerk of the court in which the respective order of rehabilitation or liquidation of each such guaranty corporation was made and entered,

and which such notice, when so filed, shall be and become a part of the record of proceedings in said court in which the respective orders of rehabilitation or liquidation were made and entered. From and after the effective date specified in each such notice and as long as each such guaranty corporation remains in rehabilitation or liquidation, the commission shall, with respect to all such bonds, notes, evidences of indebtedness, mortgages, property, *contracts* and moneys, be and become vested, by operation of law, with possession and control thereof and legal title thereto, without prejudice to the equitable rights, if any, of the superintendent of insurance or the superintendent of banks, as the case may be, or of the respective guaranty corporations *or other corporations* previously having possession and/or control of, or legal title to, such bonds, notes, other evidences of indebtedness, mortgages, property, *contracts* and moneys, and shall exercise to the extent and in the manner in this act provided, in the place and stead of the superintendent of insurance or the superintendent of banks, as the case may be, all of the functions heretofore granted to the said superintendent of insurance or the superintendent of banks, as the case may be, by chapter seven hundred and forty-five of the laws of nineteen hundred thirty-three, as amended, and in addition thereto may exercise any and all of the additional powers granted by this act. Upon the written direction of the commission all persons, firms or corporations shall forthwith cease to exercise or perform any of the agencies, duties, functions and powers theretofore conferred upon them by the superintendent of insurance or the superintendent of banks, as the case may be, in respect to all such bonds, notes, other evidences of indebtedness, mortgages, property, *contracts* and moneys, and shall promptly deliver the same to the commission, together with all insurance policies, records and data relating thereto which may be in their possession or under their control. The commission, in taking over the possession and control of, and legal title to, the bonds, notes, other evidences of indebtedness, mortgages, property, *contracts* and moneys herein referred to, shall without limiting any of the powers granted to it by this act, be deemed to be the successor of the superintendent of insurance or the superintendent of banks, as the case may be, who took possession, control and/or title by virtue of any order or orders of rehabilitation or liquidation heretofore or hereafter entered in any court with respect to any guaranty corporation *or other corporation* heretofore or hereafter having ownership and/or control of such bonds, notes, other evidences of indebtedness, mortgages, property, *contracts* and moneys, and the commission shall be substituted in the place and stead of such superintendent as a party in any pending proceeding affecting

mortgage investments covered by this act, and the supreme court shall continue to have jurisdiction over such bonds, notes, other evidences of indebtedness, mortgages, property, *contracts* and moneys, subject, however, to the provisions of this act."

Since its original enactment, this section has been several times amended. The word " the " in the title has been added; the time within which the Commission shall take over the property provided to be taken over has been changed from originally ninety days, to six months; in the clause " shall be taken over " in the opening lines of the section, the word " hereafter " has been omitted after the word " shall;" and the originally incorrect spelling of the word " increment " has been corrected. Vital amendments were, however, added by chapter 638 of the Laws of 1935, effective May 1, 1935, and the portions above which have been italicized by the court represent the amendments thereby effected. Giving effect to these exceptions, the section will then read as originally enacted. Except to the extent provided in section 6, the Mortgage Commission Act is not intended to supersede the Schackno Act (Mortgage Commission Act, § 18).

Insurers are still under the supervisory jurisdiction of the Superintendent of Insurance and he continues to apply, under appropriate circumstances, for an order of rehabilitation or of liquidation, and he is the officer the order designates to conduct or to liquidate the business. He takes possession of, or title to, the property of such insurer according as the order may provide for rehabilitation or liquidation, and would still seem to have the right to administer under the Schackno Act the property of an insurer as he did prior to the enactment of the Mortgage Commission Act, but this would seem to be so only until such time, within six months after the entry of an order of rehabilitation or liquidation, as the Commission serves upon him the written take-over notice provided for by section 6 of the Commission Act. The property not provided to be taken over by the Mortgage Commission Act, the Superintendent continues to administer.

The Mortgage Commission Act is interwoven with the Schackno Act. Both embody the legislative scheme whereby certificate holders, by following the statutory procedure prescribed, themselves may manage and control the mortgage investments in which they are interested, because the guaranty corporation that had undertaken to do so, failed to perform its promises, and until such time as the certificate holders take over their respective mortgage investments, to have the same administered in their interest by a State agency.

And now, with respect to the immediate applications before the court, it appears that four petitions seek substantially the same relief; the hearing of two of them, viz., of Sylvia Zubow and of August Hattauer, has been adjourned without day, and only the issues relating to the petitions of Samuel Marton and of Herbert N. Frey have come on to be heard.

Samuel Marton is co-owner and coholder of a so-called guaranteed first mortgage certificate, issued by Title Guarantee and Trust Company (sometimes in this memorandum referred to as the Title Company) and guaranteed by guaranty No. 203,131 of Bond and Mortgage Guarantee Company (sometimes in this memorandum referred to as the Guarantee Company) with respect to a bond and mortgage of $129,000. Approximately eighty-nine investors were holders of certificates under this issue, that of petitioner being of the face amount of $4,000. Samuel Marton bought this certificate on February 28, 1935, not from the Title Company but from his predecessor in interest, and it was transferred to his name on the books of the Title Company on March 6, 1935, both dates antedating the day upon which chapter 638 of the Laws of 1935, amending the Mortgage Commission Act, went into effect. Prior to its purchase, the Superintendent of Insurance had initiated a proceeding (Reoganization Plan No. 456) in the Supreme Court, Kings county, to reorganize the aforesaid mortgage, pursuant to the provisions of chapter 745 of the Laws of 1933, as amended, and the matter came on to be heard on January 23, 1935. The reorganization plan as promulgated was of the type commonly known as an extension and reduction plan, i. e., among other things it provided for an extension of the aforesaid mortgage at a reduced rate of interest, with the owner of the equity in the mortgaged premises remaining in possession. On February 18, 1935, an interlocutory order was entered wherein said plan, as in said order amended by the court, was approved. Thereafter, proof having been presented that the necessary holders in principal amount had consented to such plan, on March 27, 1935, a final order and on April 23, 1935, a resettled final order were entered.

Herbert N. Frey, petitioning on behalf of Selma Margolin, his sister, and of himself, is the owner and holder, as is also his sister, of a so-called guaranteed first mortgage certificate issued by Title Guarantee and Trust Company and guaranteed by Bond and Mortgage Guarantee Company (guaranty No. 211,350) with respect to a bond and mortgage of $115,200. Approximately thirty-one investors are holders of certificates under this issue, those of petitioner Frey and his sister being each of the face amount of $10,000. Each of said two certificates was purchased by the above holders

from the Title Company on May 9, 1930. Thereafter and in July, 1934, the Superintendent of Insurance instituted a proceeding (Reorganization Plan No. 167) in the Supreme Court, Kings county, to reorganize said mortgage, pursuant to chapter 745 of the Laws of 1933, as amended, and the matter came on to be heard on August 27, 1934. The reorganization plan promulgated was likewise of the type generally known as an extension and reduction plan. There was entered on September 15, 1934, a final order and on November 8, 1934, an amended final order.

The petitioners now before the court seek an adjudication that chapter 638 of the Laws of 1935 and other related sections of chapter 19 of the same laws are unconstitutional, to have the Mortgage Commission of the State of New York enjoined from demanding and from receiving or assuming control of mortgages being serviced by Bond and Mortgage Guarantee Corporation, and said corporation, Title Guarantee and Trust Company and the Superintendent of Insurance as rehabilitator of Bond and Mortgage Guarantee Company, from assigning, transferring and/or delivering the said bonds and mortgages and papers relating thereto.

Let us before giving consideration to any question of whether or not any rights have been invaded, first consider the nature of the guaranteed first mortgage certificates issued by Title Guarantee and Trust Company, a domestic banking corporation. By the terms of its so-called guaranteed first mortgage certificate, the Title Company, therein called the Company, declares that it has received from the purchaser to whom the certificate is issued, a certain stated sum of money " for the purchase of and hereby assigns to the purchaser an undivided share equal to that amount, with interest thereon at the rate of $5\frac{1}{2}\%$ per annum in the bonds of " a named bondsman in a stated amount, with its due date, " and in the first mortgage securing the same, covering " certain specified real property, as in the Frey certificate; and as in the Marton certificate, that it has " received from Samuel Marton * * * (hereinafter called the purchaser) or their predecessor in interest the sum of $4,000.00 for the purchase of and hereby recognizes the purchaser as the owner of an undivided share equal to that amount, with interest thereon at the rate of $5\%$ per annum, in the bond of " a named bondsman in a stated amount, with its due date, " and in the first mortgage securing the same, covering " certain specified real property. The provisions that follow are alike in both certificates, and then the certificates further state that said " bond and mortgage, together with the policy of the Bond and Mortgage Guarantee Company guaranteeing to holders of this and similar certificates payment of principal and interest, are held by the Company as

depositary and agent for the holders of such certificates which shall never aggregate more than the amount of principal remaining unpaid on said bond and mortgage, upon the following terms and conditions which are agreed to by the holder of this certificate:

" 1. The Company holds and shall continue to hold said bond and mortgage, said policy of Bond and Mortgage Guarantee Company and the other instruments and evidences of title relating thereto for the benefit of the purchaser and any other persons interested therein.

" 2. The Company, on receipt of the interest and principal of said bond and mortgage, as required therein, shall distribute the same among the persons entitled thereto. If payments not so required are made, certificates for the same amount will be called in and paid off.

" 3. The Company shall have full power to take any action it may deem necessary or desirable in order to enforce any of the provisions of said bond and mortgage and to protect the mortgage security.

" 4. The Company may for its own corporate account be the holder or pledgee of similar shares in said bond and mortgage.

" 5. The Company may take up and cancel this certificate at any time on thirty days' notice in writing to the purchaser and payment at its office, 176 Broadway, New York, of the amount then owing to the purchaser for principal and interest.

" 6. This certificate is not negotiable. The only way that the interest of the purchaser can be transferred is by the surrender of this certificate to the Company duly assigned and the issuing of another certificate to the transferee."

At the foot of the face of the certificate is the statement: " While the bond secured by the mortgage mentioned in this certificate is payable by its terms on its due date the policy of the Bond and Mortgage Guarantee Company entitles it at its option to a period of eighteen months thereafter in which to collect the principal. Regular payment of interest meanwhile is guaranteed."

Participation certificates in bonds and mortgages seem to have been known to the law of the State for many years. In *Matter of Cheesborough* (N. Y. L. J. Oct. 5, 1895), for example, Title Guarantee and Trust Company owned a bond and mortgage which was deposited with Bond and Mortgage Guarantee Company, the guarantor, and the former had issued participation certificates against it. A trustee invested in these certificates and the surrogate refused to approve the investment.

There was no specific statute authorizing a fiduciary to invest in shares or parts of bonds and mortgages until 1918, but with the

passage of chapter 544 of the Laws of 1918 a field of enlarged opportunity opened up for participation certificates. While before that, a trustee or other person holding trust funds for investment was authorized by section 21 of the Personal Property Law to invest the same in bonds and mortgages on unincumbered real property in this State worth fifty per centum more than the amount loaned thereon — and an executor, administrator, trustee or other person holding such funds was likewise so authorized by section 111 of the Decedent Estate Law — the authority comprehended within both of said sections was expanded so as to include as a legal investment " shares or parts " of such bonds and mortgages, provided certain conditions were fulfilled; and the provisions of said sections in this regard are at present substantially the same as then.

These statutes very evidently constitute the foundation upon which was built up the form of guaranteed first mortgage certificate issued by the Title Company, although, of course, such certificate does not purport to guarantee that the investment it evidences constitutes a legal investment for trust funds, nor is it the intent of the court to express herein any opinion whatever as to whether or not any such certificate constitutes an investment suitable for trust funds. However, before any investment by a fiduciary in shares or parts of a bond and mortgage itself legal, is authorized by the aforesaid sections, they (substantially alike) provide (1) that " any share or part of such bond and mortgage so held shall not be subordinate to any other shares or parts thereof and shall not be subject to any prior interest therein;" (2) that " bonds and mortgages in shares or parts of which any fiduciary may invest trust funds, together with any guaranties of payment, insurance policies and other instruments and evidences of title relating thereto shall be held for the benefit of such fiduciary and of any other persons interested in such bonds and mortgages, by a trust company " or other corporation specified by the act; (3) that " a certificate setting forth that such corporation holds such instruments for the benefit of such fiduciary and of any other persons who may be interested in such bonds and mortgages among whom the corporation holding such instruments may be included, be executed by such corporation and delivered to each person who becomes interested in such bond and mortgage;" and further (4) that " every corporation issuing any such certificate shall keep a record in proper books of account of all certificates issued pursuant to the foregoing provisions " of the act. The requirements of clauses (1), (2) and (4) above need not be stated on the certificate and are matters concerning compliance with which it is the duty of a fiduciary investing trust funds himself to ascertain before investing. But the certificate

setting forth the statement provided for by clause hereinabove designated (3) is required to be executed and delivered to each person who becomes interested in such bond and mortgage.

The guaranteed first mortgage certificate of the Title Company sets forth on its face that said company has received a sum of money " for the purchase of and hereby assigns to the purchaser an undivided share " in a designated bond and mortgage which with the policy of the Guarantee Company are held by the Title Company " as depositary and agent for the holders of such certificate * * * upon the following terms and conditions which are agreed to by the holder of this certificate," and a comparison of paragraphs designated 1, 4 and 6 on such certificate with the respective statutory provisions referred to will reveal their kinship. The basis is there. The Title Company, the record owner of the mortgage, holds such mortgage " as depositary and agent for the holders of such certificates,"— as *depositary* for the benefit of the holders of the undivided shares represented by such certificates (the relevant portions of the aforesaid sections of the Decedent Estate Law and the Personal Property Law being in effect the deposit agreement) and as *agent*, with respect to the agency powers appearing on the face of the certificate and agreed to, and so conferred by, the holder thereof. No agreement, in express words, appears anywhere on the face of the certificate, that the Title Company will perform any promise; the certificate merely assigns an undivided share and then sets forth that the Title Company holds the deposited documents for the benefit of the certificate holders. An assignment of part only of a debt, though single and entire in its character, is valid (*Chambers* v. *Lancaster*, 160 N. Y. 342; *Risley* v. *Phenix Bank of City of New York*, 83 id. 318), and it would seem that the Legislature in the enactment of the aforesaid sections of the Decedent Estate Law and the Personal Property Law has expressly authorized part assignments of bonds and mortgages, in any event, for the purposes of said enactments, and, inasmuch as the customary practice of delivering the bond and mortgage with an assignment of a whole mortgage cannot well be carried out in the case of a part assignment, that it has further provided for the deposit of the mortgage instruments with a depositary, in the interest of the several parts or shares assigned. " Words and Phrases " (Vol. 7, p. 6473) states that " the word ' share ' ordinarily means a part or definite portion of a thing owned by a number of persons in common. It contemplates something owned by two or more persons, and has reference to that part of the undivided interest which belongs to some one of them." Hardly, moreover, may it be assumed that an investment in a " share or

part " of a bond and mortgage by a fiduciary, or an assignment of an " undivided share " of a bond and mortgage to a purchaser, may be satisfied by a chose in action rather than by a chose in possession. No technical trust was created by the terms of a so-called guaranteed first mortgage certificate, but only an agency, and the holder and owner of such a certificate owns a legal title to " an undivided share " in such mortgage as a tenant or owner in common.

No standard form of participation certificate seems to have been adopted by the several mortgage guaranty companies, and no statutory form seems to have been prescribed. That one considered by the court in *Matter of People* (*Tit. & Mtge. Guar. Co.*) (264 N. Y. 69) was construed as a primary obligation of the guaranty company with the mortgages assigned only as collateral security for the debt. The certificate in that case differs radically from the certificates of Title Guarantee and Trust Company. There a trust company depositary had possession of certain bonds and mortgages in the name of Title and Mortgage Guarantee Company of Buffalo, deposited under certain written deposit agreements, in substantially the same form, providing that upon request in writing of certain designated officers of the Title Company " the· Trust Company shall certify, authenticate and deliver certificates from time to time in the form herein specified to an aggregate amount equal to but in no event exceeding the total principal sum secured to be paid by the bonds and mortgages held by the Trust Company or deposited under the terms of this agreement and owing thereon; and the Title and Mortgage Company shall be at liberty to sell and dispose of such certificates " (p. 79). Certificates were issued by Title and Mortgage Guarantee Company of Buffalo each referring to a specific agreement and the group series of bonds and mortgages deposited thereunder, and they were sold by said company. The certificate on its face stated that it was not valid until authenticated by the depositary and a form was printed on the reverse side thereof to meet this requirement. The certificate contained numerous provisions, including one that " ten years after the date of this Certificate the Company agrees to pay to the registered holder hereof (unless previously paid) the principal sum hereby secured and any interest at the rate aforesaid then accrued, upon receiving a good and sufficient assignment of this Certificate, which Certificate and assignment such registered holder shall deliver to the Company." In analyzing all the provisions of the contract, the court declared that the " guaranty company has entered into an unconditional promise to pay, ten years from the date of the certificate, ·the principal sum secured and accrued interest and has transferred to

the holder only an interest in the deposited mortgages as collateral security for its debt." No such promise attaches, however, to a certificate issued by Title Guarantee and Trust Company, which as already indicated, creates an ownership in the mortgage itself, as a tenant in common.

Such was the interest of a certificate holder which was represented by a certificate issued by the Title Company, and from the face of which it also appeared that the certificate was guaranteed by Bond and Mortgage Guarantee Company. Said company had for many years guaranteed mortgages under its powers as a domestic insurance corporation and had guaranties of many hundreds of millions of dollars of mortgage interests outstanding when pursuant to article XI of the Insurance Law an order for its rehabilitation was made on August 2, 1933, and the Superintendent of Insurance took over the possession of its property and the conduct of its business and undertook the rehabilitation of said company. When chapter 745 of the Laws of 1933 was enacted, the Superintendent further exercised the additional powers conferred upon him thereby and also promulgated the plans already referred to, under which the mortgage investments held by said petitioners were reorganized, as he did many others.

Subsequently when the Mortgage Commission Act was passed, the Commission took steps to take over from the Superintendent and from other persons certain of such reorganized mortgage investments and other property, as to which the right of so doing is resisted.

The Mortgage Commission Act, as originally enacted, having gone into effect on February 5, 1935, and having been amended by chapter 638 of the Laws of 1935 (effective May 1, 1935), and the Commission having qualified, thereafter on May 7, 1935, pursuant to section 6 of said act, the Commission served upon and filed with the Superintendent of Insurance a take-over notice, dated said date and effective May 16, 1935, with respect to the bonds and mortgages against which mortgage investments had been issued or guaranteed by " Bond and Mortgage Guarantee Company in Rehabilitation." A written demand dated May 8, 1935, was also served with a copy of said notice on Title Guarantee and Trust Company requiring said company to comply with all of the provisions of said Commission Act and to cease to exercise any of the agencies, duties, functions and powers theretofore conferred upon it by the Superintendent " in respect to all such bonds, notes, other evidences of indebtedness, mortgages, property and moneys " and to deliver the same to the Commission along with all insurance policies, records and data relating thereto, in its possession or control. The Mortgage Com-

mission is demanding that Bond and Mortgage Guarantee Corporation, the Superintendent of Insurance, and Title Guarantee and Trust Company turn over to it all such property.

The Mortgage Commission, Title Guarantee and Trust Company, the Superintendent of Insurance, as rehabilitator of Bond and Mortgage Guarantee Company, and Bond and Mortgage Guarantee Corporation have all filed answers to the petitions presently before this court. That every necessary procedural step has been duly taken by the Commission to make the take-over effective as against such persons has not been questioned by any of said parties. A question does arise, however, as to the right of the Mortgage Commission to take over from the Title Company and from the Guarantee Corporation all of the bonds, notes, other evidences of indebtedness and mortgages in respect whereof outstanding investments have been issued or guaranteed by Bond and Mortgage Guarantee Company. We will discuss first the issues connected with the servicing contracts of the Guarantee Corporation and then those connected with the bonds and mortgages held by the Title Company.

The Guarantee Corporation takes the position that it cannot comply with said notice in so far as it purports to include servicing contracts entered into between it and the Title Company made part of any court order heretofore entered in a reorganization proceeding under the Schackno Act. Bond and Mortgage Guarantee Corporation was organized on August 2, 1933, as a domestic insurance corporation, with a capital of $1,000,000, a surplus of $2,000,000 and a reserve for contingencies of $200,000, all of which was paid out of the assets of the Guarantee Company in exchange for the entire capital stock of the new corporation — 10,000 shares of the par value of $100 each; a certificate for said number of shares was issued in the name of the Guarantee Company and is held by the Superintendent of Insurance as an asset, for the benefit of the creditors (including the policyholders) of the Guarantee Company. Said Guarantee Corporation was formed in furtherance of the plan of rehabilitation set forth in the petition of the Superintendent, and of the order of rehabilitation dated August 2, 1933. Said order authorized the Superintendent " to adopt with such modifications as he   *   *   *   shall consider wise, and subject to the further directions of this Court, the plan of rehabilitation outlined in the petition of the Superintendent filed herein." The petition stated that said plan was approved by the Insurance Board (created by chapter 524 of the Laws of 1933) and preliminary advice with respect to it was given by New York Guaranteed Mortgage Protection Corporation (a non-profit making stock corporation organized for the benefit of holders of participations in

guaranteed mortgages pursuant to the provisions of chapter 453 of the Laws of 1933), and the Superintendent was authorized and empowered to take all such steps as may be necessary or advisable to carry out the terms and provisions of said plan. In his petition the Superintendent further alleged that but for the creation of the new corporation and the continuance through it of the old company's business, the good will and earning power of the latter would be lost.

The Guarantee Corporation was regarded as a very important factor in the plan of rehabilitation of the Superintendent and one important purpose of its being was to preserve a valuable good will and a profitable business for the creditors and policyholders of the Guarantee Company. Under such sponsorship and endowed with such property, it came into being as a step " toward the removal of the causes and conditions which made such " rehabilitation proceeding necessary. " To carry out such plan it may at times be necessary to sell the assets or to transfer certain personal property. Such a course has been held proper when it best serves the interests of the creditors and is for their protection." (*Matter of National Surety Co.*, 239 App. Div. 490, at p. 497; affd., 264 N. Y. 473.)

The success of the new corporation in large measure depends upon its ability to hold and satisfactorily continue the business of the old company, and all fair and reasonable efforts to make this possible and to put the assets of the old company to work should be encouraged. A failure successfully to carry on the business endangers the value of its good will as an accompaniment of unsatisfactory earnings, while on the other hand, its successful operation would lead to, not alone a contribution of earnings for the ultimate benefit of the creditors and policyholders, but to the preservation for them as well, of this no mean item of good will.

The Superintendent further was authorized by said order to execute the administration contract dated August 2, 1933, annexed to the petition and forming part of the plan therein outlined. By this contract entered into between the Guarantee Company acting by the Superintendent as rehabilitator and the Guarantee Corporation, the latter undertook *inter alia* to service all the mortgages remaining under the administration of the company in rehabilitation. This contract was as of November 30, 1934, terminated by mutual agreement and thereafter by contract dated December 1, 1934, the Guarantee Corporation and a wholly owned subsidiary undertook to service the whole mortgages. At the same time the Superintendent appointed said two corporations his agents to exercise the powers conferred upon him by sections 3 and 4 of the Schackno Act.

Soon after the Mortgage Commission qualified under the Mortgage Commission Act, it entered into a contract with said Guarantee Corporation dated as of April 27, 1935, but to become operative as of the effective date specified in the take-over notice, for the servicing by the Guarantee Corporation of the certificated mortgages taken over by the Commission pursuant to the act. Said contract may by its terms be canceled by the Commission, by giving thirty days' notice in writing to Guarantee Corporation, and by Guarantee Corporation, by giving one hundred and twenty days' like notice to the Commission. It appears from the testimony that the chairman of the Mortgage Commission has already notified the president of the Guarantee Corporation that the Commission is about to cancel said contract, but that no written notice to that effect has yet been given. The Guarantee Corporation, pursuant to its appointment as agent of the Superintendent to exercise the powers conferred upon him by sections 3 and 4 of the Schackno Act, serviced certificated mortgages for the Superintendent until he was superseded by the Commission on May 16, 1935, the effective date of the take-over notice with respect to certificated mortgages guaranteed by the Guarantee Company.

When before that date a Schackno reorganization was carried to final order, the plan quite consistently proposed making the Guarantee Corporation servicing agent for the certificate holders. The notice of hearing submitted to the certificate holders along with a copy of the promulgated plan in the reorganization involving the Frey certificate (Reorganization Plan No. 167) states that at the time and place named therein such plan will be presented to the court, which will then pass upon said plan, hear any objections thereto, and hear and pass upon such other or further proposals for the benefit of certificate holders as the court deems proper; that the court will be asked to enter an order approving, modifying or disapproving such plan, and if an order approving the plan is submitted or modified to enter an order that such plan so approved become binding upon all holders upon proof that sixty-six and two-thirds per cent in principal amount of the holders shall have approved the same. The notice further stated that a copy of said plan and the servicing agreement will be kept at the Certificate Reorganization Division of Bond and Mortgage Guarantee Company at a given address. Such copy of the plan promulgated included the statement that the agency of the Guarantee Company to service the mortgage will be revoked and the Guarantee Corporation appointed during the extended period; that a form of proposed servicing agreement will be filed with the court as a part of the proceeding and that the Guarantee Company had agreed that the

employment of the Guarantee Corporation as servicing agent should not operate as such a revocation of its agency as would entitle it to claim that the policy of guaranty had been terminated. The plan also stated that upon its approval the court will be requested to direct the Title Company to enter into the servicing agreement with the Guarantee Corporation. Such was the general scope of the notice and of the plan to which petitioner Frey not alone gave his written consent, but also his authorization to the Title Company to execute all necessary documents and to take all proper steps to carry out the plan as approved. After reciting the written consents of the holders of two-thirds in principal amount, the final order and resettled final order in Reorganization Plan No. 167 declared that said plan as amended in said order was approved by the court and as so amended was binding upon all interested parties, and directed the Title Company to enter into the servicing agreement, in the form annexed to said order, with the Guarantee Corporation. The servicing agreement thereupon appears to have been executed under date of December 4, 1934.

In the later reorganizations the usual course adopted was substantially to follow that used in the proceedings to reorganize the mortgage in which the Marton certificate was interested (Reorganization Plan No. 456). Here substantially the same form of notice was used as was involved in the Frey proceeding except that it stated that besides a copy of the plan, a copy of the proposed servicing agreement was also being submitted. The plan included a similar statement with respect to revocation and the appointment of the Guarantee Corporation for the extended period, but added that such appointment was to be for such further period as the mortgage may be extended pursuant to the terms of said servicing agreement, a form of which it stated was inclosed; the terms on which the further extension may be given and certain other terms of such proposed agreement are also therein specifically set forth. The plan also stated that the Guarantee Company had agreed that the employment of the Guarantee Corporation as servicing agent should not operate as such a revocation of its agency as would entitle it to claim that the policy of guaranty had been terminated and further that upon the approval of the plan the court will be requested to direct the Title Company to enter into the servicing agreement with the Guarantee Corporation. The interlocutory order entered February 18, 1935, provided that the plan presented was approved by the court as amended in said order, and as so amended was to become binding upon all the interested parties upon satisfactory proof that the holders of sixty-six and two-thirds per cent in principal amount of the mortgage investment in question

had approved the same and upon such proof a final order may be entered *ex parte* authorizing and empowering the execution of all documents necessary or convenient to the consummation of said plan, and said interlocutory order further provided that upon the execution of the extension agreement, the Title Company enter into the servicing agreement with the Guarantee Corporation in the form introduced in evidence with such modifications as may be necessary to comply with the terms of the plan as amended and approved by the court. It was not until February 28, 1935, that petitioner Marton purchased his certificate and while it does not appear that he consented to the plan, both the final order entered March 27, 1935, and the resettled final order entered April 23, 1935, after reciting that the necessary sixty-six and two-thirds per cent in principal amount of such mortgage investments had given their written consents to said plan, approved said plan as amended, declared it to be binding upon all the parties interested, and directed that any and all documents necessary or convenient in the consummation of said plan be executed. Such final order also provided that the court may substitute a different servicing agent upon application of the Mortgage Commission or of sixty-six and two-thirds per cent in amount of the certificate holders. The Title Company and the Guarantee Corporation appear to have executed the servicing agreement under date of May 9, 1935.

Upon the entry of the final orders approving the reorganization plans aforesaid, and the plans becoming operative, the certificate holders in each instance by common statutory consent effected a withdrawal of their mortgage from the Guarantee Company, and themselves agreed to administer it as provided by the operative reorganization plan, and having done this, the certificate holders stand no longer in need of the temporary administration of a State agency.

Such reorganizations had the effect of modifying the agency powers originally conferred on the Title Company by the terms of its guaranteed first mortgage certificate and created a grant of authority to the Title Company to enter into the servicing contracts, on the terms approved of, on behalf of the certificate holders.

Hearings generally in Schackno reorganization promulgated by the Superintendent commenced on March 27, 1934. Such reorganizations for the most part involved an extension of the mortgage and the appointment of a new servicing agent, and after July, 1934, substantially all of the plans promulgated by the Superintendent involving an extension, with the owner remaining in possession, proposed the Guarantee Corporation as the new servicing agent. Orders providing for servicing by Guarantee Corporation involve

a very large number and face amount of mortgages. The bulk of all of the reorganizations involving issues against a group of mortgages, were either trustee plans or corporate plans.

Section 6 of the Commission Act as originally enacted did not contain the clause " including any and all contracts incident to the management, servicing or control of such bonds, notes, other evidences of indebtedness, mortgages, properties or securities, which contracts were made a part of any court order heretofore entered in a reorganization proceeding under section [*sic*] seven hundred forty-five of the laws of nineteen hundred thirty-three as amended." Said clause was added as one of the amendments to the act by chapter 638 of the Laws of 1935; the bill therefor was introduced in the Legislature on April 15, 1935, passed on April 17, 1935, the last day of the 1935 session, and became a law on May 1, 1935, when it was approved by the Governor. If the contention of the Commission is correct, it may under this amendment terminate at pleasure otherwise subsisting servicing contracts so long as they constitute part of a court order made and entered prior to May 1, 1935.

The statutory amendment purports to be emergency legislation, and while the act as originally enacted by chapter 19 of the Laws of 1935 recited numerous findings of the Legislature in justification of the passage of said chapter as such legislation, and its operative provisions as then passed presumably wholly met the conditions by reason of which the act became necessary, there appears to be no legislative declaration in chapter 638 of the Laws of 1935 of the existence of any other or further circumstances calling for the extraordinary provisions of the above amendment. But with this omission aside, to hold that such contracts so entered into by the Guarantee Corporation as aforesaid are to be disregarded because of the enactment of the amendment aforesaid, shocks our conception of the sanctity of the law. The Mortgage Commission regards such contracts not alone as property which it may take over, but which, having taken over, it may cancel at its pleasure. The aforesaid provisions of the amendment as enacted expressly relate to servicing contracts which were " made a part of any court order heretofore entered " in a Schackno proceeding. Moreover, the Commission Act provides that the Commission, in taking over the property provided thereby to be taken over, shall take over (if nothing more) " possession and control of " such property — clearly something more than mere custody, and indicative rather of the right of management, over certificate holders' own property already withdrawn from the administration of the Superintendent, and in the custody of the Title Company. It will not be presumed that the Legislature intended to pass an unconstitutional statute.

The provisions of the plan as approved and the rights of the parties interested in any mortgage investment, are in a Schackno reorganization proceeding, finally fixed and determined, as of the date of its entry, by the order entered upon the approval of the plan by the court after the necessary percentage in principal amount of certificate holders have also approved it. That is the order which by the language of the act finally approves the plan, and which binds all the parties interested in the mortgage investment being reorganized; it is in these respects in effect a final decree.

It was, however, any court order entered before May 1, 1935, in a Schackno reorganization proceeding and whose terms provided that a certain approved servicing contract was to be entered into by the Title Company so as to make consummate the plan finally approved of by such order, that determined whether any such servicing contract so made part of any such order was or was not included within the scope of the amendment. Any such servicing contract so found to be included, the aforesaid amendment purported to turn over to the Commission, irrespective of whether the formal act of executing and delivering it in furtherance and satisfaction of the terms of the order of which it and its execution were made a part, was in fact fulfilled prior or subsequent to the aforesaid date. If any such contract made a part of any such court order in a Schackno proceeding was reduced to writing and delivered by the Title Company and Guarantee Corporation before May 1, 1935, and Guarantee Corporation, not being a party to such proceeding, accordingly voluntarily executed any such contract — as in the reorganization in which the Frey mortgage was involved — its contract rights were invaded; if, however, such order was entered before said date but such contract was reduced to writing and delivered thereafter and Guarantee Corporation, being a party to such proceeding, accordingly perhaps involuntarily executed such contract — as in the reorganization in which the Marton mortgage was involved — its rights, vested in any event by such court order of which such servicing contract was made a part, were violated. " It has long been settled by decisions of this court that the word ' contracts ' in § 10 of article I of the Constitution is used in its usual or popular sense as signifying an agreement of two or more minds, upon sufficient consideration, to do or not to do certain acts. ' Mutual assent [express or implied] to its terms is of its very essence.' " (*Crane* v. *Hahlo*, 258 U. S. 142, at p. 146, and cases there cited.)

When the language of a statute clearly requires a retroactive construction it must be so construed though thereby it is held to be unconstitutional. (*Westervelt* v. *Gregg*, 12 N. Y. 202.) Retro-

active statutes are not of themselves unconstitutional, but when they are in conflict with the provisions of either the Federal or the State Constitutions, a different result may follow. Such result follows where, as here, such a statute violates the right of the parties to such a servicing contract made part of any such order, to perform and to have performed the provisions of such contract, or it interferes with a vested right conferred by an order in the nature of a decree of which a servicing contract is made a part, finally adjudging the rights of the parties and the provisions of such contract. After a final determination of the rights of the parties to such a proceeding has been rendered, such rights " have passed beyond the legislative power, either directly or indirectly, to reach or destroy. After adjudication the fruits of the judgment become rights of property. These rights became vested by the action of the court and were thereby placed beyond the reach of legislative power to affect." (*Gilman* v. *Tucker*, 128 N. Y. 190, at p. 204.) The court in *Stuart* v. *Palmer* (74 N. Y. 183, at p. 191) said: " It is difficult to define with precision the exact meaning and scope of the phrase, ' due process of law.' * * * It may however be stated generally that due process of law requires an orderly proceeding adapted to the nature of the case in which the citizen has an opportunity to be heard, and to defend, enforce and protect his rights. A hearing or an opportunity to be heard, is absolutely essential. We can not conceive of due process of law without this. In his argument in the *Dartmouth College Case* (4 Wheat. 519), Webster defined ' due process of law ' as a proceeding ' which proceeds upon inquiry and renders judgment only after trial.' " (See, also, to the same effect, *Ochoa* v. *Hernandez*, 230 U. S. 139, at p. 161.) The provisions of chapter 638 of the Laws of 1935 in so far as they purport to require turning over such servicing contracts made part of any final court order entered prior to May 1, 1935, deprive the Guarantee Corporation and the certificate holders, the real parties in interest, of their property without due process of law in conflict with section 6 of article I of the Constitution of this State (*Livingston* v. *Livingston*, 173 N. Y. 377; *Gilman* v. *Tucker, supra; Germania Savings Bank* v. *Village of Suspension Bridge*, 159 N. Y. 362; *Burch* v. *Newbury*, 10 id. 374) and are in conflict with the Fourteenth Amendment to the Constitution of the United States. (*Coombs* v. *Getz*, 285 U. S. 434; *Memphis* v. *United States*, 97 id. 293; *McCullough* v. *Virginia*, 172 id. 102.) Moreover, the aforesaid provisions of said amendment impair the obligations of contracts in violation of paragraph 1 of section 10 of article I of the Constitution of the United States. (*Delmas* v. *Insurance Co.*, 81 U. S. 661; *Red Rock* v. *Henry*, 106 id. 596; *County of Clay* v. *Society for Savings*, 104 id. 579; *Danolds* v. *State of New*

*York,* 89 N. Y. 36; *New York Sanitary Co.* v. *Dept. of Health,* 61 App. Div. 106; *Matter of Cook,* 86 id. 586.)

But the Commission contends that the Guarantee Corporation in servicing mortgages is acting without adequate corporate powers. Guarantee Corporation was organized pursuant to article 5 of the Insurance Law as a title and mortgage guaranty corporation and the certificate of authorization given by the Superintendent of Insurance certified that said corporation had complied with all the requirements of law to be observed by it, other than those expressly waived by him under authority vested in him to do so, and further certified, in substantially the language of the statute, as to what powers were conferred by its charter. Therein no express power of servicing mortgages appears, although the power to invest in, purchase and sell, or guarantee the payment of mortgages, does. The servicing of mortgages up to now has constituted the bulk of the business of said corporation, insurance but very little, if any. The plan of rehabilitation contained in the Superintendent's petition for the order of rehabilitation outlined a plan whereby the new company was to continue the Guarantee Company's business of insuring mortgages but on a restricted basis under a limited policy of guaranty. Although this plan was approved, the business of guaranteeing mortgages was never carried on, due at first to the restrictions placed on such business by the rules promulgated by the Superintendent of Insurance and then by the prohibitory statute known as chapter 920 of the Laws of 1935, and due also to economic conditions. The Guarantee Corporation has not abandoned the mortgage loan business, but expects to do a general mortgage business when economic conditions permit. It appears from the evidence that the servicing of mortgages is one of the essential features of a mortgage loan corporation if it is to open up a ready market for the sale of its mortgages, and without an efficient organization for the servicing of mortgages it is difficult to carry on a mortgage loan business; that the servicing of mortgages is enabling the Guarantee Corporation to open up a market which, when the time comes around and which it is getting ready for, will put it in a position to do a regular mortgage loan business; that servicing is a necessary adjunct to a mortgage loan corporation; and that without servicing, Guarantee Corporation could hardly open up a market for the sale of mortgages because investors will not again buy mortgage investments unless they see, or have the opportunity of buying from, the person who will continue servicing the loan. Under the circumstances Guarantee Corporation cannot fairly be charged as a delinquent, with having failed, or with having ceased, to conduct a mortgage loan business. Corporations such as Guar-

antee Corporation although under the supervision of the Superintendent of Insurance and organized under article 5 of the Insurance Law, have nevertheless the power to engage in business transactions not strictly classed as insurance. Such corporations are authorized among other things to " invest in, purchase and sell with or without guaranty, or guarantee the payment of the same without purchase, bonds " (Insurance Law, § 170) and mortgages, and it is as a necessary incident of the mortgage loan business which they are authorized to conduct, that the right to service mortgages, with or without guaranty, arises. (See *Steinway* v. *Steinway & Sons*, 17 Misc. 43, where the court said [at p. 47]: " It is a question, therefore, in each case of the logical relation of the act to the corporate purpose expressed in the charter. If that act is one which is lawful in itself and not otherwise prohibited, is done for the purpose of serving corporate ends and is reasonably tributary to the promotion of those ends, in a substantial and not in a remote and fanciful sense, it may fairly be considered within charter powers.")

Neither is the court in harmony with the contention that the Guarantee Corporation is a State agency inseparable from the Superintendent of Insurance, and the evidence in that regard is quite to the contrary. Said corporation is like any other corporation, a distinct entity. All of its stock is owned by Guarantee Company and the certificate therefor is held in the custody of the Superintendent; this he holds as he does any other assets of the company in rehabilitation, as a receiver designated by statute for the benefit of the creditors and stockholders of said company — not as an owner, representing the State. It is a stock corporation, having been created, for one thing, with a view to its possible sale for the benefit of the creditors, as its exhaustive by-laws make apparent. During such time as the stock control remains as it is, the operation of the corporation is to be under the supervision of the Superintendent as rehabilitator. Nevertheless, its operations must be, as is the case with any other stock corporation, under the primary direction of its board of directors who are directly responsible for their trust to the stockholder, *i. e.*, the Guarantee Company, represented by the Superintendent for the purposes of rehabilitation. Supervision of the operation of the corporation the Superintendent may doubtless exercise, but its actual direction may not be taken away from the board of directors and the evidence shows that the Superintendent has done nothing toward directing or assisting in the management of the corporation, other than at the annual meeting of stockholders, to elect the board, which in turn has taken full responsibility for the management. The board of directors elects its officers. The present board is made up of sixteen

directors, all men of standing in the community, and the Superintendent appears now to hold the resignations of six or seven of them. The holding of such resignations does not imply, however, that such directors shall act in any other manner than in obedience to their primary trust. Should the acts of any one of them be inconsistent with the supervision of the Superintendent in his capacity as rehabilitator of its sole stockholder, that doubtless might constitute the ground, if any were needed, for the removal of such director by the Superintendent acting in the interest of its stockholder, but until removal such director is bound, ever mindful of the best interests of the corporation and obedient to the acts governing said corporation, to vote on any proposal before the board in accordance with his own best judgment. If the action taken by the board is inconsistent with the supervision of the Superintendent in his capacity as supervisor of insurance companies, he may take such steps as are lawful to carry out his requirements. Neither is there any question of fraud on which to base a piercing of the corporate veil, and the Guarantee Corporation is to be regarded as a distinct and separate corporate entity of itself, apart from its stockholder or the statutory receiver of such stockholder. The corporation is not an arm of the Insurance Department of the State, nor is it a corporation wholly owned by the Superintendent.

And now, as to the issues in their relation to the bonds and mortgages on deposit with the Title Company. Title Guarantee and Trust Company is a domestic corporation existing under the Banking Law and was closely associated for many years with Bond and Mortgage Guarantee Company. The practice between these two companies was for the former to make mortgage loans from its own funds and to become mortgagee of record; these mortgages it sold either in whole or in part. When it did not sell a whole mortgage, it issued and sold certificates evidencing an " undivided share " in a specific mortgage or in a group of mortgages. All mortgages sold or certificated by the Title Company were guaranteed by Bond and Mortgage Guarantee Company. The evidence shows that the form of certificate issued to petitioner Frey was one that was used for many years prior to 1933; that in the case of a certificate issued against a group of mortgages, instead of stating on its face the specific bond and mortgage against which the certificate was issued, such a certificate by its terms referred to a group series number (the particular number in any case representing Guarantee Company's guaranty policy number); that group mortgages were not subject to any power of substitution; that the physical custody of the bonds and mortgages certificated was, as stated on the face of the certificate, with the Title Company, the practice of the Title Com-

pany being to deposit such bonds and mortgages with its trust department; that such custody was not disturbed by a reorganization and that such bonds and mortgages are still in the vaults of the Title Company. It also appears that interest and taxes accruing since reorganization have been regularly paid on the mortgages to which the Frey and Marton certificates are related, and that no objection to the servicing rendered by the servicing agent has been made by any certificate holder.

The Title Company had served upon it the written demand with a copy of the take-over notice already referred to. The contracts which it entered into with the Guarantee Corporation were pursuant to the order of the court and were entered into on the behalf and for the benefit of the certificate holder owners of the reorganized mortgages.

The applicable provisions of section 6 of the Commission Act line up the persons from each and every one of whom the act provides the Commission is to take over " all of the bonds, notes, other evidences of indebtedness and mortgages in respect whereof outstanding mortgage investments have been issued or guaranteed by " Bond and Mortgage Guarantee Company and all property acquired in lieu thereof or as security therefor, with all the accumulated income and profits thereon. The language used is so all-comprehensive as to the persons who may be included in this category, that it might easily be that many trust companies in the State which have apportioned or transferred a part interest in a bond and mortgage held by them but guaranteed by a guaranty corporation now in rehabilitation or liquidation, may find themselves in the position of having issued and disposed of mortgage interests within the language of this section. Not free from ambiguity, then, these provisions must be given such reasonable construction as the language used will permit.

The bonds and mortgages against which certificates were issued with the then appurtenant documents were prior to reorganization, and still remain, in the actual custody of the Title Company as depositary. The Title Company undoubtedly answers to the description of one if not more of the several classes of persons referred to in the aforesaid section. By the terms appearing on the face of its guaranteed first mortgage certificate, the Title Company holds and is to continue to hold the bond and mortgage, the policy of guaranty of the Guarantee Company and the other instruments and evidences of title relating thereto for the benefit of the purchaser of the certificate and any other persons interested therein. Were the turn-over controlled solely by the Mortgage Commission Act, it would appear that said act ordinarily contemplates the

taking over of such documents as the Title Company holds as aforesaid.

The provisions of the Schackno Act made it possible to effect an organization of the theretofore scattered holders of mortgage certificates and a reorganization of their mortgage investments, and when these provisions were followed out it became possible for the owners of a certificated mortgage to deal with their mortgage investments quite as effectually as the holder of a wholly-owned mortgage could deal with his. And so a large number of promulgated plans became operative under the Schackno Act, in which the agency of the Guarantee Company was revoked and Guarantee Corporation was designated as servicing agent, as in the Marton and Frey issues. Whenever any such reorganization plan becomes operative, the powers and duties of the Superintendent are terminated as to any such mortgage investment so reorganized and the certificate holders undertake to manage their property. The powers conferred upon the Superintendent by the Schackno Act must " be regarded as provisions for safeguarding the interests of groups of holders of mortgage investments until a plan can be devised for permanent administration of these investments. Pending action by the group the fund must be conserved." (*Matter of People* [*Tit. & Mort. Guar. Co.*], 264 N. Y. 69, at p. 91.)

The Schackno Act and the Commission Act are complementary acts, to be read together, and in construing a statute, the intention of the Legislature may be collected from the act itself and other acts in *pari materia*. (*Burch* v. *Newbury*, 10 N. Y. 374.) No provision of the latter act (save the provisions respecting the turning over of the servicing agreements entered into pursuant to court orders, as to which the court has already expressed its opinion) declares an intention that a Schackno reorganization already made operative by final order and the consent of the actual owners of the mortgage shall become of no effect when the Commission under the provisions of the act, takes over the mortgages guaranteed by the Guarantee Company or that the Commission may treat such reorganized mortgages as if a reorganization thereof had not been effected. Every reasonable intendment of the act is to the contrary.

The purpose of the Legislature in enacting the Commission Act was not to retard the administration of mortgage investments or to increase the cost of their administration or to impede the right of the holders thereof, by appropriate group action, themselves to take the necessary steps to organize and to agree upon the manner in which their mortgage investments should be managed in their interests. The act was rather, as the Legislature expressly declared, " to encourage, promote and facilitate self-organization " by the

holders of such investments. And so in furtherance of this declaration we find the act makes provision (as to property taken over pursuant to it) for terminating the jurisdiction of the Commission: By a summary withdrawal on petition of not less than fifty-one per cent of the holders of mortgage investments as provided by section 9; by a withdrawal of such property from the Commission and a vesting thereof in a trustee or corporation upon a plan of reorganization promulgated by certificate holders, as provided by section 10; by a termination under a plan approved by the court where such plan vests title, possession or control over property which the Commission has in possession, in some other person, as provided by section 18; and by a termination resulting from the expiration of the duration of the emergency on January 1, 1940, when any mortgages or property at that time possessed by the Commission shall be taken over by the Superintendent, as provided by section 34. The Commission is empowered also by subdivision 16 of section 4 to terminate its functions and surrender any bond or mortgage held by it to any person representing all the holders of mortgage investments issued against such bond or mortgage.

Every rehandling of a certificated mortgage, with the several interests involved in such a mortgage, makes more involved the status and rights of the certificate holders, who have no security given them as a recourse for possible losses while their investments are in the administration of a State agency. Certificate holders who have moreover already incurred expenses incident to a reorganization should not be made to bear, unnecessarily, the additional expense that the Commission Act provides may be allotted against each bond and mortgage coming under its purview, and it will not be presumed that a statute conceived in aid of the interests of certificate holders contemplates any act — not expressly declared — which without good reason therefor increases their expenses. If the Commission Act did in fact require another reorganization proceeding, merely because a successor agency had been created by said act, such requirement might be unconstitutional. (*Hoyt Metal Co.* v. *Atwood*, 289 Fed. 453.) A Schackno reorganization under a plan such as that in which petitioners Marton and Frey were interested, terminated the powers of the Superintendent upon such plan becoming operative, and the Commission Act did not confer upon the Commission the right to take over any such reorganized mortgage investment.

In the opinion of the court the Title Guarantee and Trust Company continues to hold as depositary and agent the bond and mortgage, the policy of guaranty of the Guarantee Company and the instruments and evidences of title relating thereto, for the

benefit of the certificate holders and any other persons interested therein in the case of any mortgage investments reorganized as aforesaid, and the Mortgage Commission Act leaves them undisturbed.

Settle order on notice, in accordance with the foregoing.